**Opinion filed April 8, 2021**



In The

# Eleventh Court of Appeals

_____

## No. 11-19-00138-CR

_____

## JENNIFER MARIE MASIAS, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 29th District Court**
**Palo Pinto County, Texas**
**Trial Court Cause No. 16521A**

### M E M O R A N D U M   O P I N I O N

The grand jury indicted Appellant, Jennifer Marie Masias, and twelve codefendants for the first-degree felony offense of engaging in organized criminal activity by conspiring to distribute a controlled substance, namely methamphetamine, in an amount of four grams or more but less than two hundred grams.  TEX. PENAL CODE ANN. § 71.02(a)(5), (c) (West Supp. 2020); TEX. HEALTH & SAFETY CODE ANN. § 481.102(6) (West 2017), § 481.112(d) (West Supp. 2020).

The jury found Appellant guilty of the charged offense, found an enhancement allegation to be true, and assessed Appellant's punishment at life imprisonment in the Texas Department of Criminal Justice, Institutional Division, and a $10,000 fine. *See* PENAL § 12.42(c)(1) (West 2019). The trial court sentenced Appellant accordingly. On appeal, Appellant challenges, in two issues, the legal and factual sufficiency of the evidence to support her conviction. We affirm.

## I. *Factual Background*

From September 2016 to May 2017, Appellant and her twelve codefendants were the focus of an extensive drug investigation in Palo Pinto County. The investigation, referred to as Operation Homeward Bound, involved the collaboration of law enforcement officers from various agencies in the coordination of traffic stops of suspects, the use of GPS trackers on suspects' vehicles, the extraction and review of suspects' cell phone records and data, and the interviews and surveillance of suspects. The operation yielded thousands of pages of offense reports, hundreds of hours of video of traffic stops and suspect interviews, and thousands of text messages and pages of phone records.

Appellant was a primary supplier of methamphetamine to the members of the conspiracy in Palo Pinto County; she obtained multiple ounces of methamphetamine each week from a supplier in the Dallas–Fort Worth Metroplex and would return to Palo Pinto County with those quantities. During the course of the nine-month investigation that began in September 2016, Appellant was arrested five times in connection to her possession of large amounts of methamphetamine. The majority of the evidence that was relied on to indict Appellant was seized by law enforcement pursuant to these arrests and with the assistance of GPS tracking.

### A. *First Arrest: September 6, 2016*

Appellant was first arrested in connection to this case on September 6, 2016. On this date, law enforcement officers, among them Officer Robert Allensworth of

the Mineral Wells Police Department and Deputy John Baker of the Palo Pinto County Sheriff's Department, responded to reports of a disturbance—that a woman, Appellant, had confronted a man at gunpoint in the parking lot of an E-Z Mart in Mineral Wells. After they arrived at the E-Z Mart, law enforcement made contact with Appellant and Vincent Gonzales, the man who claimed that Appellant had confronted him at gunpoint. Appellant denied that she possessed a firearm and consented to a search of her vehicle. Deputy Baker searched Appellant's vehicle and discovered four baggies in the center console, which contained a large amount of methamphetamine. No firearm was found in Appellant's vehicle. Appellant's identification card was also discovered in the center console. Appellant and Gonzales were both arrested for possession of the methamphetamine because neither would claim ownership of it.

Officer Allensworth testified that, pursuant to the routine procedure for these types of investigations, law enforcement did not test the baggies for fingerprints or for DNA. Furthermore, law enforcement did not search Appellant's person at the scene of her arrest because no female officer was available to conduct the search in accordance with departmental policy. Appellant was later searched during the booking process at the jail, and a small amount—less than one gram—of methamphetamine was discovered on her person.

The Texas Department of Public Safety lab report indicated that the substance that was seized from Appellant's vehicle was analyzed and determined to be methamphetamine and that it had a net weight of approximately 23.2 grams. DPS Special Agent Mitchell Jones, who worked closely with the investigators of the operation, testified that a "user" amount of methamphetamine typically would be less than one gram but that one gram could produce multiple doses for methamphetamine users. He also testified that possession of more than one gram of methamphetamine typically indicated "dealer" amounts that were meant for

distribution. According to Special Agent Jones, an amount of methamphetamine between four and two hundred grams would be characterized as a "distributional" amount because, to maximize profits, it could be divided into smaller units and sold to users.

B. *Second Arrest: November 17, 2016*

Officer Wesley Hamilton of the Euless Police Department was a narcotics investigator for the Palo Pinto County Sheriff's Department at the time of these events. Investigator Hamilton was part of the City County Narcotics Unit (CCNU), a collaborative law enforcement task force that involved the Palo Pinto County Sheriff's Department and the Mineral Wells Police Department; this task force focused on drug investigations in the area. He began the investigation—part of Operation Homeward Bound—into Appellant's activities after he received multiple reports that Appellant was "selling a lot of methamphetamine" in the area.

On November 17, 2016, Investigator Hamilton initiated a traffic stop after he observed Appellant fail to stop at an intersection before the marked white line. During the traffic stop, Investigator Hamilton further observed that Appellant appeared to be increasingly agitated; he also detected the odor of marihuana emanating from Appellant's vehicle. He requested Appellant's driver's license, but she was unable to locate it. Investigator Hamilton observed that, as she searched various areas of her vehicle for her identification, Appellant would not look at the center console; in fact, she appeared to studiously avoid doing so. He testified that this appeared strange because, in his experience, the center console was a common place for people to store their identification. He instructed Appellant to exit the vehicle and empty her pockets. Appellant complied and revealed that she had a large amount of cash on her person, which Investigator Hamilton testified was a common trait of suspected drug dealers. Investigator Hamilton then searched Appellant's vehicle and discovered a bag containing methamphetamine in the center console.

4

He also located two electronic scales, a pipe containing methamphetamine residue, and pills that appeared to be the prescription drugs hydrocodone and carisoprodol. The discovery of these items indicated to Investigator Hamilton that Appellant was a drug dealer. The seized methamphetamine was analyzed and, according to the DPS lab report, had a net weight of 167.17 grams.

C. *Phone Records Extracted After November 17, 2016 Arrest*

Subsequent to Appellant's arrest, Investigator Hamilton also seized three cell phones that were in Appellant's possession. He obtained and executed a search warrant for each phone. The searches of these phones revealed ample evidence of numerous drug transactions between Appellant and several other individuals, some of whom were codefendants.

Based on his twenty-one years of experience in law enforcement and narcotics investigations, Special Agent Jones testified about his interpretation of the many text messages that were exchanged between Appellant and various other codefendants between November 11 and November 17. He testified about his interpretation of the voluminous excerpts of text message conversations that were read to and published to the jury at Appellant's trial, each of which depicted the arrangement and execution of numerous drug transactions between Appellant and other codefendants, including Mary Jacqueline Batchelor, George Luis Soria, Juan Maravilla Vega Jr., and Delfino Martinez Garcia IV.

For example, in the records extracted from Appellant's cell phone after her November 17 arrest, Appellant had exchanged text messages with Soria that, according to Special Agent Jones, indicated the pair had negotiated a series of drug transactions. Soria texted to Appellant, "Yeah, got your money," and the text thread included photographic images of methamphetamine. These and many other incriminating messages were transmitted between November 11 and November 17.

In Appellant's text exchanges with Batchelor spanning the dates of November 10 through November 14, the two women discussed an exchange of cash. Batchelor also requested that Appellant provide her "a whole shorty," which Special Agent Jones interpreted to mean Batchelor had requested an ounce of methamphetamine. During this exchange, Appellant kept Batchelor informed that she intended to pick up new product in Dallas, after which they eventually agreed to meet at a Walmart during Appellant's return to Palo Pinto County. Batchelor later texted Appellant that she had arrived at the Walmart, and she also mentioned that "Luis" (the name commonly used to refer to Soria) had also arrived at the Walmart.

In text messages between Appellant and Vega, spanning the dates of November 3 through November 15, Vega requested a "size seven" on multiple occasions. Special Agent Jones testified that this term meant that Vega wanted to purchase seven grams of methamphetamine, a quarter of an ounce, from Appellant. Other text messages indicated multiple and ongoing drug transactions between Appellant and Vega between November 3 and November 15.

Between November 13 and November 17, a similar exchange of text messages occurred between Appellant and Garcia, which Special Agent Jones testified was also indicative of their ongoing drug transactions.

Special Agent Jones testified that he searched Bobby Dockins's phone, pursuant to a lawfully obtained search warrant, and discovered a text message thread between Dockins and a phone number associated with Appellant. According to Special Agent Jones's interpretation of these and other messages, Appellant and Dockins discussed drug debts and other aspects of drug transactions. Special Agent Jones testified that, in that period of time, thousands of text messages had been sent to and received by Appellant that reflected Appellant's ongoing drug transactions with Vega, Batchelor, Soria, Dockins, and Garcia, even though none of the text messages contained the words "methamphetamine" or "meth."

6

While confined in the Palo Pinto County jail for the November 17 arrest, Appellant made several telephone calls and received some visitors; all of these interactions and encounters were recorded by law enforcement. Appellant called two indicted codefendants in the alleged conspiracy, namely Batchelor and Jarrett Masias.[1] Appellant instructed them to collect drug debts from other codefendants to the alleged conspiracy, including Soria, Vega, and Dockins. Appellant also called Motley's Bail Bonds. During that recorded telephone call, Appellant acknowledged that she knew there were drugs in her vehicle when she was arrested.

D. *GPS Tracker Placed on Appellant's Vehicle: November 21, 2016*

Pursuant to a lawfully obtained order, Investigator Hamilton placed a GPS tracking device on Appellant's vehicle on November 21, 2016. The tracker detected that, on November 27, Appellant traveled to an address in Dallas that was later determined to be a well-known location for drug activity. CCNU investigators arranged for surveillance of this address two days later, and they observed a significant number of people going to and from this address in a manner that was consistent with drug activity. Within the thirty-day period that the GPS tracker was affixed to Appellant's vehicle, Appellant traveled to this surveilled address multiple times.

E. *Third Arrest: December 1, 2016*

After Appellant visited the Dallas address on December 1, 2016, Investigator Hamilton and Special Agent Jones coordinated a traffic stop of the vehicle Appellant operated as she returned to Palo Pinto County. DPS Trooper Brent Henson testified that he initiated the traffic stop of Appellant's vehicle in coordination with the CCNU investigators. Accompanied by another DPS officer, Trooper Robert Litvin, Trooper Henson stopped Appellant for a speeding violation

---

[1]Jarrett Masias is Appellant's nephew, and he will be referred to as "Masias" in this opinion.

and for driving without a license. Deputy Michael Childs of the Parker County Sheriff's Department arrived at the traffic stop as backup; Trooper Henson had arranged in advance for Deputy Childs to assist in the stop.

Trooper Henson then instructed Appellant to exit her vehicle; two passengers—Masias and Dockins—were also in Appellant's vehicle. Masias and Dockins identified themselves to Trooper Henson, and he then observed an open beer can in the backseat of Appellant's vehicle near Dockins. Trooper Henson instructed both men to exit the vehicle. He briefly frisked each of them for weapons, and then searched the vehicle. During the search of Appellant's vehicle, Trooper Henson discovered a glass pipe containing crystal residue. Appellant, Masias, and Dockins were all thereafter placed in handcuffs; Trooper Henson continued his search of Appellant's vehicle but did not find any methamphetamine or other contraband. The officers at the scene later decided to search the suspects more thoroughly, and during the search, a large bag of what appeared to be methamphetamine fell out of Masias's pants onto the ground. The officers discovered another similar, large bag of methamphetamine on the ground near the area where Masias and Dockins were standing. The officers then deployed a canine unit. Although the canine alerted on Appellant's vehicle, the officers were unable to find any additional contraband.

According to the DPS lab report, only one of the two seized bags of contraband were analyzed. The substance in that bag was determined to be methamphetamine. The net weight of the methamphetamine was 55.53 grams. The gross weight of the other bag, which also contained a crystalline substance, was 50.73 grams.[2]

---

[2]Special Agent Jones later searched Appellant's impounded vehicle and discovered approximately 1.77 grams of methamphetamine lying in the crevice of the driver's seat. The crystals were "loose" on the seat, unsecured in a bag or other container.

Appellant, Masias, and Dockins were arrested, and each suspect was interviewed by Special Agent Jones. Appellant denied responsibility for the two seized bags of methamphetamine and stated that the contraband belonged to Masias. Special Agent Jones testified that, during a recorded visitation at the Parker County jail, Appellant explained to her girlfriend, Mikeulyn Ruggles, that Masias did not have a criminal record: "That's why I have people like him with me." Their discussion indicated that Masias was present during drug transactions so that he could be blamed for the presence of any seized contraband. According to Special Agent Jones, this is a common practice among drug traffickers.

During cross-examination by Appellant's trial counsel, Special Agent Jones testified that the seized bags of methamphetamine were not analyzed for fingerprints or DNA. He also testified that the vehicle driven by Appellant was registered to John Teague, an unindicted suspect who was listed on the State's organizational chart that depicted the hierarchy of the conspiracy.

F. *Fourth Arrest: April 25, 2017*

DPS Trooper Daniel Hubbard conducted a traffic stop of Appellant in Ellis County on April 25, 2017, after he observed that one of the headlights on Appellant's vehicle was not illuminated. Appellant and Ruggles were the only occupants in the vehicle. During the stop, Trooper Hubbard noted that the vehicle's registration had been expired for almost one year, that the vehicle's window tint appeared to be darker than legally permitted, and that Appellant's driver's license was suspended. He also noticed a backpack located on the floorboard near the front passenger seat. The top of the backpack was open, and in plain view, he saw a large glass pipe with crystalline residue protruding from the backpack.

Trooper Hubbard instructed both Appellant and Ruggles to exit Appellant's vehicle; he then searched the vehicle. During the search, he discovered a loaded nine-millimeter handgun under the passenger seat. In the backpack, he found three

glass pipes with residue and six clear plastic containers that contained various amounts of methamphetamine, marihuana, and pills. Luggage located in the trunk contained a digital scale, a small white box with methamphetamine crystals scattered on the bottom, small baggies that contained methamphetamine, and various packing materials.

Ruggles adamantly claimed ownership of the handgun, the drugs, and the paraphernalia. Trooper Hubbard testified that he did not find any affirmative links to connect Appellant to the backpack. He arrested Appellant for driving without a license and without insurance; Ruggles was arrested for possession of the contraband. Trooper Hubbard testified that, to his knowledge, the drug containers, baggies, and paraphernalia had not been analyzed for fingerprints or DNA.

The DPS lab report indicated that the contraband seized from Appellant's vehicle on this date included methamphetamine with a net weight between eight and nine grams.

G. *Fifth Arrest: May 8, 2017*

Special Agent Jones and Investigator Hamilton went to Appellant's home address on May 8, 2017, to execute a felony warrant for her arrest. During the process of executing the warrant and arresting Appellant, they discovered methamphetamine, marihuana, and drug paraphernalia inside her home. They also seized a cell phone from Appellant. This phone contained text messages concerning numerous drug transactions between Appellant, various codefendants, and other unindicted suspects.

In addition to the thousands of text messages that were retrieved from the cell phones that were seized from Appellant as a result of her multiple arrests and searches, Appellant's cell phone records showed that hundreds of calls were made to similar numbers and to various other codefendants, and other unindicted suspects, within short, similar periods of time.

Appellant and twelve other codefendants—including Dockins, Batchelor, Masias, Vega, Soria, and Garcia—were indicted for engaging in organized criminal activity by conspiring to distribute a controlled substance (methamphetamine) in an amount of four grams or more but less than two hundred grams. The indictment filed against Appellant alleged eight overt acts purportedly committed by Appellant in furtherance of the charged offense. The overt acts alleged against Appellant included her conduct of communicating with Dockins, Batchelor, Vega, Soria, and Garcia to further the activity of the distribution of methamphetamine, and her possession, together with Dockins and Masias, with the intent to deliver, methamphetamine in the amount of four grams or more but less than two hundred grams on November 17, 2016, and December 1, 2016.

## II. *Standard of Review – Sufficiency of the Evidence*

Appellant asserts, in two issues, that the evidence is legally and factually insufficient to support her conviction for the charged offense.[3] We note that the distinction between the legal and factual sufficiency standards of review has been abandoned. *Brooks v. State*, 323 S.W.3d 893, 894–95 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 289 (Tex. App.—Eastland 2010, pet. ref'd) ("Accordingly, a challenge to the factual sufficiency of the evidence is no longer viable.").

Thus, we review a challenge to the sufficiency of the evidence, regardless of whether it is denominated as a legal or factual sufficiency challenge, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks*, 323 S.W.3d at 912; *Polk*, 337 S.W.3d at 288–89. Under the *Jackson* standard, we

---

[3]Appellant acknowledges that a factual sufficiency review has been merged into the legal sufficiency review analysis but, without offering a specific argument, asks us to ignore established precedent as set forth in *Brooks*. *See Brooks v. State*, 323 S.W.3d 893, 894–95 (Tex. Crim. App. 2010). We decline this invitation and further note that Appellant's inadequate and cursory briefing on this issue waives any argument regarding the reversal of established precedent. *See* TEX. R. APP. P. 38.1(i).

review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

When conducting a sufficiency review, we consider all of the evidence admitted at trial and defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013); *Brooks*, 323 S.W.3d at 899; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778. We may not reevaluate the weight and credibility of the evidence to substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Therefore, if the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012); *Clayton*, 235 S.W.3d at 778.

Because the standard of review is the same, we treat direct and circumstantial evidence equally. *Isassi*, 330 S.W.3d at 638; *Clayton*, 235 S.W.3d at 778; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor and can, without more, be sufficient to establish his guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper*, 214 S.W.3d at 13). A guilty verdict does not require that every fact must directly and independently prove a defendant's guilt. *Hooper*, 214 S.W.3d at 13. Instead, the cumulative force of all the incriminating circumstances may be sufficient to support the conviction. *Id.* Therefore, in

evaluating the sufficiency of the evidence, we must consider the cumulative force of the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017); *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015).

### III.  *Analysis*

Appellant asserts, in two issues, that the evidence is insufficient to support her conviction of engaging in organized criminal activity by conspiring to distribute a controlled substance, namely methamphetamine, in an amount of four grams or more but less than two hundred grams.  Appellant raises no specific argument regarding her issues.  Rather, she asserts that her conviction cannot stand because the evidence presented at trial established that none of the seized contraband was found on her person and that neither her fingerprints nor her DNA was found on any of the seized drug packages.

A person commits the offense of engaging in organized criminal activity if, "with the intent to establish, maintain, or participate in a combination or in the profits of a combination," she "commits or conspires to commit" one of the predicate offenses described in the statute.  PENAL § 71.02(a); *see Hughitt v. State*, 583 S.W.3d 623, 627 (Tex. Crim. App. 2019); *Burt v. State*, 567 S.W.3d 335, 340 (Tex. App.— Eastland 2017, pet. ref'd).  As such, a person may engage in organized criminal activity by *either committing or conspiring to commit* the underlying predicate offense.  *Burt*, 567 S.W.3d at 342 (citing *Barrera v. State*, 321 S.W.3d 137, 142–43 (Tex. App.—San Antonio 2010, pet. ref'd)).  Here, Appellant was specifically indicted for "conspir[ing]" to commit the underlying predicate offense, not for actually committing the underlying predicate offense.  Subsection (a)(5) provides that the delivery or distribution of a controlled substance is one such predicate offense.  PENAL § 71.02(a)(5); *see Hughitt*, 583 S.W.3d at 627; *Burt*, 567 S.W.3d at 340.

13

The gravamen of the offense of engaging in organized criminal activity is a circumstance surrounding the conduct—the existence or creation of a combination that collaborates to carry on criminal activities. *See O'Brien v. State*, 544 S.W.3d 376, 391 (Tex. Crim. App. 2018). A "[c]ombination" requires that three or more persons collaborate to carry on criminal activities. PENAL § 71.01(a) (West 2011); *Nguyen v. State*, 1 S.W.3d 694, 695 (Tex. Crim. App. 1999). "Profits" means property constituting or derived from any proceeds obtained, directly or indirectly, from an offense listed in Section 71.02. PENAL § 71.01(c). The Penal Code further provides that a person "[c]onspires to commit" when she "agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense and that person and one or more of them perform an overt act in pursuance of the agreement." *Id.* § 71.01(b). Such an agreement may be inferred from the acts of the parties. *Id.* The overt act "need not [itself] be criminal"; however, "acts that suffice for party liability—those that encourage, solicit, direct, aid, or attempt to aid the commission of the underlying offense—would also satisfy the overt act element of section 71.02." *Estrada v. State*, 609 S.W.3d 311, 318 (Tex. App.—Amarillo 2020, no pet.) (quoting *Otto v. State*, 95 S.W.3d 282, 284 (Tex. Crim. App. 2003)). Accordingly, to convict Appellant of the charged offense, the State was required to prove that Appellant (1) conspired to commit, (2) the distribution of a controlled substance, namely methamphetamine, (3) with the intent to establish, maintain, or participate in a combination or in the profits of a combination.

In this case, the State adduced sufficient evidence to support the jury's verdict that Appellant engaged in organized criminal activity as charged in the indictment. In addition to the extensive and undisputed testimony and the video evidence of Appellant's arrests on November 17, 2016, and December 1, 2016, which showed that Appellant possessed methamphetamine in an amount of four grams or more but less than two hundred grams, the State presented an abundance of text messages,

14

recorded telephone calls, and jail visits that, considered in context, further showed that Appellant was a major participant, and at times the prime mover, in a criminal combination of three or more people, all of whom intended to distribute methamphetamine in Palo Pinto County. This evidence clearly showed that Appellant frequently communicated with various other participants throughout law enforcement's nine-month investigation into Appellant's ongoing drug operations.

Appellant further contends that no evidence was presented to show that she possessed any methamphetamine because she was never found to be in actual possession of the seized contraband, nor were her fingerprints or DNA detected on the seized drug packages. Appellant's contention is misplaced. Here, Appellant was charged with conspiring to distribute a controlled substance. The Health and Safety Code defines "distribute" as "to *deliver* a controlled substance other than by administering or dispensing the substance"; it defines "deliver," in relevant part, as "to transfer, actually *or constructively*, to another a controlled substance . . . . The term includes offering to sell a controlled substance." HEALTH & SAFETY § 481.002(8), (14) (emphasis added); *see also Hughitt*, 583 S.W.3d at 627–31. As we have said, the evidence in the record supports Appellant's conviction for engaging in organized criminal activity by conspiring to distribute a controlled substance, namely methamphetamine. Furthermore, she has not raised any other point of contention in support of her issues on appeal.

Consistent with the applicable standards of review, we have carefully reviewed all of the evidence in the light most favorable to the jury's verdict. Here, there is substantial evidence that Appellant conspired to distribute methamphetamine. In the most egregious of instances, Appellant was arrested while in possession of approximately 167 grams and 105 grams of methamphetamine on November 17 and December 1, respectively. The evidence also established that Appellant was a significant participant, and at times the primary organizer, in a

criminal combination that collaborated to further the combination's delivery and distribution activities. Within the time period of Appellant's aforementioned arrests, the thousands of text messages that were sent and received between Appellant and her coconspirators also established their continuous discussions of the combination's extensively planned and executed drug transactions. This evidence, without more, constituted only a portion of the State's evidence and is more than sufficient to support the jury's verdict and Appellant's conviction.

Because we hold that the record before us contains sufficient evidence from which a rational jury could have found beyond a reasonable doubt that Appellant engaged in organized criminal activity as charged in the indictment, we overrule Appellant's first and second issues on appeal.

## IV. *This Court's Ruling*

We affirm the judgment of the trial court.



W. STACY TROTTER

JUSTICE


April 8, 2021

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.